IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

BASLE HOLDINGS LTD., CHATSWORTH
ASSET MANAGEMENT, LTD., COMMODITY
TRADE LTD., KILGARVAN INVESTMENT
& HOLDING CO., LTD.,
MICHAEL T. CRONIN, ESQUIRE, and
MAX SCHMID,

       Plaintiffs,

                                  Case No.

       v.

FREEHAND SYSTEMS, INC.,
f/k/a U.S. ENVIRONMENTAL, INC.,
ANGELO J. PANZARELLA,
RON HOTTOVY, and
HOLLADAY STOCK TRANSFER, INC.,

       Defendants.

_____/

## VERIFIED COMPLAINT

Plaintiffs, BASLE HOLDINGS, LTD., CHATSWORTH ASSET MANAGEMENT, LTD., COMMODITY TRADE LTD., KILGARVAN INVESTMENT & HOLDING CO., LTD., MICHAEL T. CRONIN, ESQUIRE, and MAX SCHMID hereby sue Defendant FREEHAND SYSTEMS INTERNATIONAL, INC. ("FreeHand" or the "Company"), formerly known as U.S. ENVIRONMENTAL, INC. ("USE"), ANGELO J. PANZARELLA, RON HOTTOVY, and HOLLADAY STOCK TRANSFER, INC. ("HOLLADAY"), and allege as follows:

1.     This is an action both in law and equity and seeks injunctive, declaratory, and other relief, including monetary damages arising from violations of federal and state securities laws, and Florida common law claims.

2.     Since at least September 2005 through the present, Defendant FreeHand has made material misrepresentations and omissions relating to its ownership interest in the publicly-traded corporate "shell" of USE (the ("USE Shell"), the acquisition of which was based on a scheme to defraud USE shareholders, including the Plaintiffs.

3.     FreeHand's fraudulent purported "reverse merger" with USE was orchestrated by Defendants Panzarella and Hottovy.  Hottovy was previously found guilty of, and enjoined from committing securities fraud.

4.     FreeHand knowingly, willfully, or recklessly breached its fiduciary duty to USE's shareholders, including Plaintiffs, by failing to investigate claims relating to the actual ownership of USE.

5.     In addition, during the period September 2005 through the present, FreeHand violated the anti-fraud provisions of the federal securities laws by preparing and disseminating press releases and financial statements containing material misrepresentations and omissions relating to the actual ownership of USE.

6.     Panzarella, Hottovy, and FreeHand engaged in acts and practices which constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], among other things.

7.     Hottovy, despite being permanently enjoined from violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in 2003, knowingly, willingly, or recklessly violated the anti-fraud provisions of the federal securities laws.

8.     This action also arises in part under Defendants FreeHand's and Holladay's obligations to make and keep shareholder records pursuant to Sections 17(f) and 17A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78q and 78q-1 *et seq.* and Rules 17Ad-5, 17Ad-6, and 17Ad-7 promulgated thereunder.

9.     In addition, the Plaintiffs bring Florida state law claims arising under the Florida Securities and Investor Protection Act, Fla. Stat. § 517, *et seq.,* the Uniform Commercial Code (Article 8), Fla. Stat. § 678 *et seq.,* and common law claims for breach of fiduciary duty, fraud, and conversion.

### The Plaintiffs

10.     Plaintiff BASLE HOLDINGS LTD. ("Basle") is a company registered in Bermuda.  Basle holds 400,000 shares of USE stock, as represented by USE stock certificate number 3161, issued June 20, 1997.

11.     Plaintiff CHATSWORTH ASSET MANAGEMENT, LTD. ("Chatsworth") is a Turks and Caicos company, incorporated on October 11, 1995.  Chatsworth holds 14,291,981 shares of USE stock, as represented by USE stock certificates numbered 3346 and 3353, both issued on August 26, 1998.

12.     Plaintiff COMMODITY TRADE LTD. ("Commodity Trade") is a Gibraltar company.  Commodity Trade holds 2,000,000 shares of USE stock, as represented by USE stock certificate number 3094, issued February 13, 1997.

13.     Plaintiff KILGARVAN INVESTMENT & HOLDING CO., LTD. ("Kilgarvan") is based in Nevis, Federation of St. Kitts and Nevis.  Kilgarvan held 81,379,500 shares of USE stock, as represented by USE stock certificate numbers 3073, 3144, 3176, 3238, 3256, and 3359. In addition, pursuant to an April 18, 1997 stock subscription agreement, Kilgarvan became the

51% majority shareholder of USE with anti-dilution rights up to a total of 100 million shares (the "anti-dilution provisions").

14.     Plaintiff MICHAEL T. CRONIN, ESQUIRE, is an attorney, duly licensed to practice law in the State of Florida, and is a resident of Oldsmar, Florida, which is located within the Middle District of Florida.  Cronin holds 3,841,250 shares of USE stock, as represented by stock certificates 3360 and 3361, both of which were issued August 26, 1998.

15.     Plaintiff MAX SCHMID is a resident of Oldsmar, Florida, which is located within the Middle District of Florida.  From approximately April 1997 to March 1999, Schmid was the President of USE and a Director, and holds 42,120 shares of USE stock, as represented by stock certificate numbers 3739 and 3740, both of which were issued May 21, 1999.

### The Defendants

16.     Defendant FREEHAND SYSTEMS, INC. is a Nevada corporation formed on or about March 22, 2001.  FreeHand specializes in technology applications for the music industry, including hardware, software, and digital sheet music content.  The Company was purportedly acquired by USE after a merger (treated as a reverse acquisition) in October 2005.

17.     USE, the Company's predecessor entity, was a Delaware corporation formed on or about February 19, 1988, and was authorized to transact business in Florida.  USE was originally known as Windfall Capital Corporation and operated as a development stage company in Tampa Bay (Tampa and St. Petersburg), Florida, which is located within the Middle District of Florida, until approximately August 2000.  USE ceased operations at that time, but continued to exist as a publicly-traded corporate "shell," having no assets or operations, but still having value if acquired by another corporation seeking to become "public" through a "reverse merger," as FreeHand sought to do.

4

18.    The combined company presently conducts business as FreeHand, from its principal place of business in Los Altos, California. FreeHand does business throughout the United States, including the State of Florida. The Company is publicly-held and presently trades Over-the-Counter on the Pink Sheets, with the ticker symbol FSYI.

19.    Defendant ANGELO J. PANZARELLA is a resident of Scottsdale, Arizona. Upon information and belief, Panzarella fraudulently acted as FreeHand's Director and Chairman of the Board from a date unknown until October 2005.

20.    Defendant RON HOTTOVY is a resident of Denver, Colorado.    Upon information and belief, Hottovy acted as FreeHand's Director of Corporate Finance from a date unknown until approximately June 2006.    On January 10, 2003, Hottovy was permanently enjoined from future violations of the federal securities laws and prohibited by the U.S. Securities and Exchange Commission ("SEC") from acting as an officer or director of any registered securities issuer.    After a jury trial, Hottovy was found guilty of making material misstatements and concealing them from independent auditors by manipulating accounting records, withholding documents, and making false statements to the auditors.

21.    Defendant HOLLADAY STOCK TRANSFER, INC. ("Holladay") is an Arizona corporation whose primary place of business is Scottsdale, Arizona. Holladay is a stock transfer agent registered with the U.S. Securities & Exchange Commission ("SEC"). Upon information and belief, Holladay serves as FreeHand's stock transfer agent.

### Related Parties

22.    THOMAS P. DOLAN was a former director of USE.  He served as USE's Executive Vice President, and Secretary until approximately August 2000.  Dolan served as

USE's sole director beginning August 2000, and has never formally been removed from this position.

23.     ROBERT W. LEWIS was a former director of USE.  He served as USE's Chief Financial Officer until approximately August 2000.

24.     BDO Seidman, LLP ("BDO") is a national and international accounting firm registered with the Public Company Accounting Oversight Board.  Upon information and belief, BDO served as FreeHand's accountants from approximately September 2005 through June 2007.

### Jurisdiction and Venue

25.     This Court has diversity jurisdiction in this action pursuant to 28 U.S.C. § 1332, and supplemental jurisdiction over the parties and over the Plaintiffs' state law claims pursuant to the federal "supplemental jurisdiction" statute, 28 U.S.C. §1367.  The parties are of diverse citizenship and the amount in dispute is greater than $75,000.

26.     This Court has jurisdiction pursuant to 28 U.S.C. § 2201 to provide declaratory relief in this matter.

27.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b) & (c).  Specifically, venue is proper because certain of the acts and transactions related to this action occurred in the Middle District of Florida.  FreeHand's predecessor entity, USE, conducted business in Tampa, Florida.  Additionally, the Plaintiffs obtained their stock from USE while it was doing business in the Middle District of Florida.  Moreover, the Company's stock trades nationwide (including in Florida) on the Pink Sheets, and FreeHand currently conducts business within the Middle District of Florida.

28.     The Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and

communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

## Introduction

29.     Even though FreeHand has been told numerous times that the USE Shell it purportedly acquired was actually controlled by the Plaintiffs and others who constitute the majority shareholders of the USE Shell, FreeHand has never addressed the ownership issue and continues to falsely represent that it acquired the USE Shell through a merger treated as a reverse acquisition (the "reverse merger") in September 2005.

30.     Upon information and belief, FreeHand acquired the USE Shell from Defendant Panzarella, who falsely represented that he was USE's Director and Chairman of the Board at the time of the reverse merger.  In fact, USE's sole director was Thomas P. Dolan.

31.     Defendant Hottovy represented that he was FreeHand's Director of Corporate Finance on the Company's public Internet website, and made false assurances to Dolan that USE shareholder interests (including the Plaintiffs') were being investigated by FreeHand during its post-acquisition due diligence period in October 2005.

32.     Despite being told that the USE Shell was actually controlled by majority shareholder Kilgarvan and others, and that Panzarella could not legitimately claim control over the USE Shell, FreeHand has made fraudulent misrepresentations and omissions in press releases, financial statements, and its registration statement filed with the SEC, claiming that it merged with USE on September 15, 2005.

33.     FreeHand never provided any consideration to Kilgarvan for the acquisition of the USE Shell; neither equity nor cash.

34.     In addition, FreeHand's management and counsel have been aware of the claims of Plaintiffs and other former USE investors since at least October 2006.

35.     As a result of a separate independent investigation by Plaintiff Cronin, numerous demands were made for FreeHand to provide USE shareholders with stock certificates in FreeHand's name.

36.     FreeHand's counsel has confirmed that there were problems with the "sale" of the Company by Panzarella and others, yet FreeHand has failed to investigate the transaction and continues to make material misrepresentations regarding the true ownership of the Company.

37.     The Company has breached its fiduciary duty to shareholders, despite being informed of the controversy surrounding the purported acquisition of the USE Shell.

38.     In addition, FreeHand failed to properly represent the capital stock of the Company in Consolidated Financial Statements for Fiscal Years Ended ("FYE") 2005 and 2006, as reported by BDO.

39.     Even though Kilgarvan's majority interest in the USE Shell was fully disclosed in public filings with the SEC, upon information and belief, FreeHand knowingly, willfully, or recklessly provided information containing misrepresentations or omissions of material fact to BDO.  Upon information and belief, BDO in turn used the information to prepare FreeHand's financial statements.

40.     FreeHand's financial statements, SEC filings, and other publicly available documents contain misrepresentations and omissions of material fact which falsely represent that FreeHand was acquired by USE in a reverse acquisition and falsely represent the Company's shareholder equity.

41.   Plaintiffs are USE shareholders, the Company's majority shareholders (due to Kilgarvan's anti-dilution provisions), and the true owners of the USE Shell.

42.   Plaintiffs have sought to resolve the issue of the recertification of USE stock in FreeHand's name with FreeHand and its stock transfer agent Holladay; however, the Company has failed to reissue stock certificates after more than a year of continuous efforts to compel the reissuance.

43.   Plaintiffs seek, among other things, declaratory relief, injunctive relief, and a Writ of Mandamus ordering FreeHand to confirm Plaintiffs' ownership of USE stock and requiring the Company, through its stock transfer agent, Holladay, to reissue stock certificates to Plaintiffs in FreeHand's name.

### Background

44.   Until approximately April 1999, USE unsuccessfully attempted to market its proprietary, licensed solid and hazardous waste treatment technology for commercial application.

45.   As a development stage company with limited operations, USE required constant infusions of capital, much of which was supplied by certain Plaintiffs in exchange for USE stock.

46.   Shares of USE stock are "securities" within the meaning of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq*., and Fla. Stat. § 517.021.

47.   On April 18, 1997, in exchange for a substantial infusion of additional capital, USE agreed to enter into a stock subscription agreement with Kilgarvan which provided Kilgarvan with a 51% majority interest in USE and an anti-dilution provision so that Kilgarvan would remain USE's majority shareholder.  The subscription agreement and the anti-dilution provision were approved by USE Board resolution the same day, and were fully disclosed in USE's filings with the SEC.

48.     USE's management continued to seek arrangements with other companies in order to develop the market for its technology.

49.     On January 19, 1999, while operating as USE, the Company entered into an agreement with Virtual Empowerment Network, Inc. ("VEN"), a Kansas corporation, under which VEN offered to secure additional projects which would utilize USE's technology (the "VEN Agreement").

50.     The VEN Agreement was brokered by Panzarella and others.  USE did not have any involvement with Panzarella prior to the VEN Agreement.

### The VEN Agreement

51.     Under the VEN Agreement, VEN agreed to negotiate, secure, and assign, with full rights, contracts for USE in the aggregate amount of $5 million in revenues within one year of the VEN Agreement.

52.     As part of the VEN Agreement, VEN agreed to purchase shares equaling 83% of the outstanding shares of USE.

53.     As a condition of the VEN Agreement, USE agreed to undertake a one share for one hundred shares reverse stock split on March 25, 1999 (the "Split").

54.     USE shareholders of record as of February 15, 1999 were to surrender their pre-Split shares certificates in exchange for post-Split share certificates.

55.     Not all USE shareholders exchanged their stock certificates.

56.     The Plaintiffs did not surrender all of their pre-Split certificates.  Nonetheless, each of the Plaintiffs stock holdings appear on a March 23, 1999 USE shareholder list that was maintained by USE's stock transfer agent, American Stock Transfer & Trust Co.

57.     On April 20, 1999, as a result of the VEN Agreement, VEN was issued 9,620,842 shares of USE, or 83% of the 11,591,376 issued and outstanding shares of USE common stock.

58.     The VEN Agreement and other information pertaining to the transaction were fully disclosed in USE's SEC filings, which were properly maintained until approximately September 1999.

59.     On August 8, 2000, Dolan revoked the VEN Agreement because VEN did not secure any contracts for USE as required.  Dolan's actions were proper under USE's corporate bylaws.

60.     Simultaneously, VEN lost any interest it had in USE's stock, and its voting rights were rescinded.  As a result, Kilgarvan once again became USE's majority shareholder.

61.     Dolan, who held voting proxies for Kilgarvan and other USE shareholders, instituted a number of corporate actions, including canceling the shares issued to VEN.  As a result of those actions, Dolan became USE's sole director.

62.     Even though USE ceased operations in August 2000, Plaintiffs retained their stock in USE.

63.     From August 2000 through September 2005, Dolan and others made numerous attempts to sell the USE Shell, which retained value as a publicly-traded corporate entity, in order to obtain value for its shareholders.

### FreeHand

64.     Upon information and belief, FreeHand, a privately held company based in Los Altos, California, was solicited and agreed to purchase USE in the fall of 2005.

65.     Upon information and belief, Panzarella fraudulently represented to FreeHand that he was the Chairman of the Board of USE, and controlled the Company.

66.     Panzarella did not have control over the Company, since Kilgarvan was USE's majority shareholder and never approved of or voted for Panzarella to have control over USE or be a director of the Company. Panzarella never provided Kilgarvan with any consideration to acquire its interest in USE. Moreover, Dolan remained USE's sole director.

67.     Nonetheless, on October 10, 2005, FreeHand reported that its acquisition by USE was completed and the combined companies changed their name to FreeHand.

68.     During the Fall of 2005, Dolan and others made numerous attempts to contact the Company to determine how FreeHand was able to subvert the Plaintiffs' (and majority shareholders) ownership interest in the USE Shell.

69.     In October 2005, during FreeHand's post-acquisition due diligence period, Dolan was asked to participate in a conference call with FreeHand's Director of Corporate Finance, Hottovy, and USE's former accountants and auditors, Pender Newkirk.

70.     Dolan told Hottovy (and therefore FreeHand) about the Plaintiffs' ownership interest in USE.

71.     Hottovy stated that FreeHand's attorney would contact Dolan to discuss the USE Shell ownership issue with Dolan.

72.     Dolan was not aware that Hottovy had committed securities fraud.

73.     Dolan did not receive any calls from anyone representing himself as FreeHand's attorney, however, shortly after speaking with Hottovy, Dolan received a call from Panzarella.

74.     Panzarella represented that USE's shareholders would: 1) receive freely-trading shares of FreeHand once FreeHand completed a reverse merger with USE; 2) USE's shares would be left undiluted; 3) that USE's shares would be exchanged within two weeks; 4) that

FreeHand was a going enterprise with $20 million in revenues; and 5) that the value of the Company would continue to appreciate.

75.     As a result of Panzarella's representations, Dolan and USE's other former directors, Schmid and Lewis, recommended that the Plaintiffs "wait and see," and possibly relinquish their objections, if USE's shareholders received certificates in FreeHand's name and if Panzarella's representations were true.

76.     Subsequent to the reverser merger with FreeHand, the Plaintiffs sought to exchange their shares of USE stock for stock certificated in FreeHand's name.

77.     Despite numerous demands, FreeHand has failed to provide Plaintiffs with shares certificated in FreeHand's name.

### Attorney Cronin's Independent Investigation

78.     Plaintiff Cronin, an attorney and USE shareholder, was given shares of USE in lieu of payment for services rendered when Cronin represented USE prior to August 2000.

79.     On January 13, 2006, Cronin sent a letter to Defendant Holladay, FreeHand's stock transfer agent, enclosing his USE stock certificates and requesting that new shares be issued reflecting the reverse stock split and the name change to FreeHand.

80.     Cronin expected that he would simply receive recertificated shares from FreeHand.

81.     On January 17, 2006, Holladay responded, sending Cronin a Uniform Rejection Notice, which stated "Invalid Certificate – no record of certificate or shareholder." No further explanation was provided.

82.     After independently investigating the matter, Cronin determined that USE's former stock transfer agent, American, had not forwarded a complete shareholder list to

Holladay; the shareholder list provided to Holladay did not include shareholders who did not surrender their shares to USE as a result of the VEN Agreement (described in paragraphs 51 through 63, above).

83.     Upon information and belief, American maintained a reserve reflecting pre-Split shares which were not surrendered prior to the VEN Agreement, and this reserve was reported to Holladay.

84.     On January 27, 2006, Cronin wrote to FreeHand, Holladay, and American, on behalf of the Plaintiffs, describing the results of his investigation, and requesting that FreeHand and Holladay obtain American's correct list of pre-Split shareholders to determine the validity of the Plaintiff's stock certificates.

85.     On January 30, 2006, Holladay responded, rejecting the Plaintiff's claims.

86.     On February 22, 2006, Cronin sent a letter to FreeHand demanding that FreeHand instruct Holladay to reissue certificates for himself and the Plaintiffs.

87.     On October 23, 2006, the Plaintiffs sent a letter to FreeHand reiterating their demand that FreeHand resolve the issue.

88.     Defendant's counsel responded on October 27, 2006, stating "[i]f your clients are shareholders of FreeHand . . . I will take the necessary steps to recognize their interest and correct the shareholder records of FreeHand." On December 4, 2006, Defendant's counsel confirmed that Plaintiff's were listed on American's shareholder records, and that he was "trying to sort out the numbers of shares to which your clients may be entitled."

89.     Despite FreeHand's counsel's assurances, FreeHand and its stock transfer agent Holladay have failed to reissue stock certificates from FreeHand.

### General Allegations

90.     Plaintiffs own stock of USE, now known as FreeHand.

91.     Pursuant to FreeHand and Panzarella's agreement with Dolan, USE's shareholders, including the Plaintiffs, were to receive recertificated shares of FreeHand stock.

92.     FreeHand knowingly, willfully, or recklessly has failed to provide the stock to Plaintiffs as demanded.

93.     Publicly available information on the Bloomberg Financial Service indicates that FreeHand, formerly USE, had 1.971 million shares outstanding as of March 31, 1999. The number of shares outstanding includes the shares owned by the Plaintiffs.

94.     During the period relevant to this action, FreeHand's stock has traded at prices ranging from $2.86 to $0.15. As of September 18, 2007, the stock was trading at $0.22.

95.     Defendant FreeHand made misrepresentations and omissions of material fact relating to FreeHand's acquisition of USE.  The misrepresentations and omissions were knowingly, willfully, or recklessly made and incorporated as part of FreeHand's Consolidated Financial Statements for FYE 2005 and 2006.

96.     FreeHand's Consolidated Financial Statements for FYE 2005 and 2006 were reported by the Company in approximately April 2007, were widely disseminated via the Internet, and submitted with the Company's registration statement filed with the SEC.

97.     Defendants FreeHand and Holladay have an obligation to make and keep shareholder records under the securities recordkeeping requirements of Sections 17(f) and 17A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78q and 78q-1 *et seq.* and Rules 17Ad-5, 17Ad-6, and 17Ad-7 promulgated thereunder.

98.     As a result of Defendant's actions, the Plaintiffs have suffered damages and incidental damages including, but not necessarily limited to, the unlawful detention or conversion of its stock, the expenditure of time and effort to seek the reissuance of Plaintiffs' stock certificates, the expenditure of time and effort to locate and regain control of their stock, and lost opportunity to sell the stock to others.

99.     Plaintiff has retained counsel to represent it in this action and is entitled to recovery of reasonable attorney's fees.

100.    All conditions precedent to the institution, maintenance or prosecution of this action have occurred, have been performed, or have been waived.  All of the Plaintiff's claims arose from the same transactions, occurrences or series of transactions or occurrences and there are questions of law and fact common to all Defendants which will arise in this action.

## COUNT I
### FRAUD IN VIOLATION OF SECTION 17(A)(1) OF THE SECURITIES ACT

### (Panzarella, Hottovy, and FreeHand)

101.    Plaintiffs reallege all of the allegations set out above in Paragraphs 1 through 100.

102.    Since a date unknown but at least since September 2005 through the present, Defendants Panzarella, Hottovy, and FreeHand, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, have been knowingly, willfully or recklessly employing devices, schemes or artifices to defraud; have obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to may the statements made, not misleading; and have engaged in transactions, practices and a course of business which operated as a fraud or deceit upon the Plaintiffs, as more particularly described in the paragraphs above.

103.   By reason of the foregoing, Defendants Panzarella, Hottovy, and FreeHand, directly and indirectly, have violated Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT II

### FRAUD IN VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER

**(Panzarella, Hottovy, and FreeHand)**

104.   Plaintiffs reallege all of the allegations set out above in Paragraphs 1 through 100.

105.   Since a date unknown but at least since September 2005 through the present, Defendants Panzarella, Hottovy, and FreeHand, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, have knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

106.   By reason of the foregoing, Defendants Panzarella, Hottovy, and FreeHand, directly or indirectly, have violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## COUNT III

### FRAUD IN VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, FLA. STAT. §517 *et seq.*

**(Panzarella, Hottovy, and FreeHand)**

107.   Plaintiffs reallege all of the allegations set out above in Paragraphs 1 through 100.

108.   This is an action for damages in violation of the Florida Securities and Investor Protection Act, in connection with the offer, sale, or purchase of an investment or security.

109.   The stock in FreeHand constitutes a "Security" pursuant to Fla. Stat. §517.021(17) (2006).

110.   As set forth above, Panzarella, Hottovy, and FreeHand, directly and indirectly, and in violation of Fla. Stat. §517.301:

> (a) make untrue statements of material facts upon which the Plaintiffs relied and omitted to state material facts necessary in order to make the statements made not misleading, in light of the circumstances under which they were made;

> (b) employed a device, scheme or artifice to defraud the Plaintiffs;

> (c) engaged in transactions, practices and a course of business conduct which operates or would operate as a fraud or deceit upon the Plaintiffs.

111.   By reason of the foregoing, Defendants Panzarella, Hottovy, and FreeHand, directly or indirectly, have violated the Florida Securities and Investor Protection Act, Fla. Stat. §517 *et seq.*

## COUNT IV
### FRAUD
**(Panzarella, Hottovy, and FreeHand)**

112.   This is an action for damages based upon fraud.

113.   Plaintiffs reallege all of the allegations set out above in Paragraphs 1 through 100.

114.   Since approximately September 2005 through the present, Defendants Panzarella, Hottovy, and FreeHand, willfully, knowingly, or recklessly, made misrepresentations and omissions of material fact regarding FreeHand's ownership interest in the USE Shell and other matters.

115.   Defendant Panzarella made the following intentional misrepresentations or omissions of material fact:

    a.   That Panzarella was the Chairman of the Board of USE;

    b.   That Panzarella was in control of the USE Shell;

    c.   That Panzarella had the authority to conduct a merger and acquisition of the USE Shell with FreeHand;

    d.   That USE's shareholders would be provided with freely-trading shares of FreeHand once FreeHand completed a reverse merger with USE;

    e.   That USE's shares would be left undiluted;

    f.   That the USE's shares would be exchanged within two weeks; and

    g.   That FreeHand was a going enterprise with $20 million in reserves and the Company would continue to appreciate.

116.   The Plaintiff's relied on Panzarella's fraudulent misrepresentations and omissions to their detriment, which caused them damage.

117.   Defendant Hottovy made the following intentional misrepresentations or omissions of material fact:

    a.   That Hottovy and Panzarella had arranged to circumvent Kilgarvan's ownership interest in the USE Shell;

    b.   That the USE Shell was actually controlled by majority shareholder Kilgarvan;

    c.   That Panzarella did not have control of the USE Shell; and

    d.   That FreeHand did not legitimately acquire ownership of the USE Shell.

118.   The Plaintiff's relied on Hottovy's representations as FreeHand's Director of Corporate Finance that he would undertake measures to address the USE Shell ownership issue to their detriment.

119.   As FreeHand's purported Chairman of the Board and Director of Corporate Finance, Panzarella and Hottovy had a duty to disclose all material facts regarding the actual ownership interest of the USE Shell.

120.   Defendant FreeHand made the following intentional misrepresentations or omissions of material fact in financial reports published over the Internet and filed with the SEC:

    a.  "[o]n September 15, 2005, US Environmental, Inc. ('USEV'), a Delaware public shell company acquired FreeHand Systems, Inc. ('FreeHand'), a Nevada corporation;"

    b.  That Kilgarvan was USE's majority shareholder pursuant to the anti-dilution provision; and

    c.  That Plaintiff's shares were properly represented in the Company's Statements of Shareholders' Equity.

121.   FreeHand's publicly available press releases, financial statements, and SEC registration statements did not disclose the falsity of Defendant's misrepresentations or any of the omitted facts.

122.   The Plaintiffs have suffered damages and will suffer additional damages as a direct and proximate result of Defendants' fraud.  Those damages include, but are not limited to, the opportunity to obtain consideration for the "sale" of the USE Shell, the opportunity to locate alternative purchasers for the USE Shell, the ability of the Plaintiffs to sell or transfer their stock,

Plaintiffs' lost opportunities to sell their stock, and legal fees and other fees and expenses incurred or to be incurred by the Plaintiffs to investigate and continue investigating this matter.

## COUNT V
## BREACH OF FIDUCIARY DUTY
### (FreeHand)

123.    This is an action for damages based upon breach of fiduciary duty.

124.    Plaintiffs reallege all of the allegations set out above in Paragraphs 1 through 100.

125.    At all times material to this Complaint, Defendant FreeHand's officers and directors had a fiduciary relationship with all of its shareholders with the requisite duties of care, good faith, and trust.

126.    Plaintiffs relied on Defendant Panzarella's representations that USE shareholders would receive freely-trading shares of FreeHand once FreeHand completed a reverse merger with USE, among other things.

127.    Plaintiffs also relied on Defendant Hottovy's and FreeHand's counsel's representations that FreeHand was investigating Plaintiffs' USE stock ownership issues.

128.    Plaintiffs' reliance was reasonable.

129.    Defendant FreeHand knew or was reckless in not knowing that Plaintiffs' pre-Split shares were not included in Holladay's records.

130.    In addition, upon being informed of the stock transfer record issue, FreeHand's officers and directors owed a fiduciary duty to investigate and rectify the issue.

131.    Defendant FreeHand's officers and directors breached their fiduciary duties of care, good faith, and trust with respect to Plaintiffs.

132.   Among other things, Defendant FreeHand has also committed numerous acts and omissions denying Plaintiffs their right to their stock, and which were not in the best interests of shareholders.

133.   As a direct and proximate cause of FreeHand's breach of fiduciary duty, Plaintiffs have been required to expend substantial sums to recertificate their stock, which was not in their best interest or necessary.

### COUNT VI
### ACTION FOR DECLARATORY INJUNCTION, INJUNCTIVE RELIEF, AND MANDAMUS

### (All Defendants)

134.   Plaintiffs reallege all of the allegations set out above in Paragraphs 1 through 100.

135.   This is an action for declaratory relief declaring the Plaintiffs' USE stock certificates valid and directing the Defendant reissue new FreeHand stock certificates.

136.   The Plaintiffs have a bona fide need for the declaration of their rights vis-à-vis the Defendants.

137.   There exists an uncertainty regarding Plaintiff's rights.

138.   Plaintiffs will incur immediate and irreparable injury, loss, damages, and incidental damages if Defendants are permitted to deny Plaintiffs rights to the Company's stock.

139.   Plaintiffs do not have an adequate remedy at law.  The conversion of Plaintiffs' stock will adversely affect Plaintiffs beyond the economic cost of the stock.  The damages cannot be adequately calculated in an action at law.

140.   The threatened harm to Plaintiffs substantially outweighs any possible harm to Defendants.

141.   Plaintiffs have a substantial likelihood of success on the merits.

142.    An injunction enjoining Defendants will not be against public policy or the public's interest.

**COUNT VII**

**VIOLATIONS OF THE UNIFORM COMMERCIAL CODE**

**(FreeHand and Holladay)**

143.    Plaintiffs reallege all of the allegations set out above in Paragraphs 1 through 100.

144.    Defendants FreeHand and Holladay violated the securities transfer provisions of Chapter 678, Florida Statutes (2006), which is part of the Uniform Commercial Code (Article 8).

145.    Specifically, Defendants FreeHand and Holladay have violated Fla. Stat. §§ 678.4011 and 678.4071, by unreasonably delaying the registration of or failing or refusing to register the transfer of Plaintiffs' USE stock.

146.    Plaintiffs presented Defendants FreeHand and Holladay with certificated securities and requests to register the transfer of their uncertificated securities.

147.    Plaintiffs were eligible to have the securities registered in their names.

148.    The instruction to register the securities was made by an agent who had the actual authority to act on behalf of the Plaintiffs.

149.    Reasonable assurance was given that the instruction was genuine and authorized.

150.    Any applicable law relating to the collection of taxes has been complied with.

151.    The transfer does not violate any restriction on transfer or demand that the issuer not register transfer.

152.    The transfer is rightful.

153.    As a direct and proximate result of Defendants FreeHand's and Holladay's violations, Plaintiffs have, and are continuing to suffer losses, damages, and incidental damages.

## COUNT VIII
## CONVERSION

### (Panzarella and FreeHand)

154.    Plaintiffs reallege all of the allegations set out above in Paragraphs 1 through 100.

155.    This is an action for conversion under Florida common law.

156.    Defendants Panzarella and FreeHand have knowingly, willfully and/or recklessly taken control of Plaintiffs' USE stock.

157.    Defendants Panzarella's and FreeHand's actions are depriving Plaintiffs' of their property permanently or for an indefinite time.

158.    The actions of Defendants Panzarella and FreeHand are inconsistent with any ownership interest they have in this property, which is none.

159.    Plaintiffs are suffering damages as a result of Defendant's actions.

160.    Defendant Panzarella's and FreeHand's actions have caused Plaintiffs irreparable harm for which Plaintiffs have no adequate remedy at law.

### Relief Requested

WHEREFORE, Plaintiffs respectfully request that the Court:

### I.
### Declaratory Relief

Declare, determine and find that the Defendants have committed the violations alleged herein, that Plaintiffs' stock certificates are valid, and instruct Defendant to issue FreeHand stock certificates as alleged herein.

### II.
### Injunctive Relief

Enter an injunction permanently restraining and enjoining each defendant from violating, directly or indirectly, the provisions of law and rules alleged in this Complaint.

24

## III.
## Writ of Mandamus

Issue a Writ of Mandamus directing FreeHand and Holladay to reissue Plaintiff's USE stock certificates to Plaintiffs in the name of FreeHand.

## IV.
## Further Relief

Grant such other relief as the Court deems necessary and appropriate, including without limit, any and all incidental damages caused by Defendants violations as alleged herein.

## V.
## Retention of Jurisdiction

Further, the Plaintiffs respectfully request that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Plaintiffs for additional relief within the jurisdiction of the Court.

## VI.
## Demand for Jury Trial

Plaintiffs demand trial by jury on all issues triable in this cause.

Respectfully submitted,

JOHNSON, POPE, BOKOR,
RUPPEL & BURNS, LLP

Date:  September 18, 2007

Chih-Pin Lu
Florida Bar No. 983322
chihpinl@jpfirm.com
Darryl Richards
FBN 348929; SPN 238092
darrylr@jpfirm.com
403 East Madison Street, Suite 400

25

Tampa, FL  33602
Telephone:  (813) 225-2500
Facsimile:  (813) 223-7118
Attorneys for Plaintiff

## **VERIFICATION**

I, Max Schmid, former President and Director of U.S. ENVIRONMENTAL, INC., do hereby state under oath that the factual allegations set forth herein, except those based on information and belief, are true and accurate to the best of my knowledge.

By: _____

Title: Former President/Director

Date: September 18, 2007


The foregoing instrument was subscribed and sworn to before me this 18th day of September, 2007, by *Max Schmid* who [is personally known to me] [has produced *Florida Driver's License* as identification], and who did take an oath.

_____
Notary Public
Print Name: CHARISSE MITTLE
Commission # DD389457
My Commission Expires:

Charisse Mittle
Commission # DD389457
Expires March 30, 2009
Bonded Troy Fain - Insurance, Inc. 800-385-7019

#112162v2